SADIE SMOLEN et al., Appellants, *v.* GRANDVIEW DAIRY, INC., Respondent, et al., Defendants.

Argued May 24, 1950; decided July 11, 1950.

*Bernard Meyerson* and *Irving D. Josefsberg* for appellants. The judgment of Trial Term was in accord with the law and evidence and the Appellate Division erred when it reversed the judgment and dismissed the complaint. (*Ingersoll* v. *Liberty Bank of Buffalo*, 278 N. Y. 1; *Saglimbeni* v. *West End Brewing*

*Co.*, 274 App. Div. 201, 298 N. Y. 875; *Shannahan* v. *Empire Engineering Corp.*, 204 N. Y. 543; *Textile Overseas Corp.* v. *Riveredge Warehouse Corp.*, 275 App. Div. 236; *Cullem* v. *Renken Dairy Co.*, 247 App. Div. 742; *Licari* v. *Markotos*, 110 Misc. 334; *Smith* v. *Peerless Glass Co.*, 259 N. Y. 292.)

*Herbert L. Maltinsky* and *Harry L. Marcus* for respondent. I. Negligence of defendant-respondent was neither proven nor established, consequently, the reversal of the judgment by the Appellate Division was proper. (*MacPherson* v. *Buick Motor Co.*, 217 N. Y. 382; *Cullem* v. *Renken Dairy Co.*, 247 App. Div. 742; *Garthe* v. *Ruppert*, 264 N. Y. 290; *Levine* v. *Blaine Co.*, 273 N. Y. 386.) II. The order of the Appellate Division dismissing the complaint was in accordance with law. (*Bourcheix* v. *Willow Brook Dairy, Inc.*, 268 N. Y. 1; *Smith* v. *Peerless Glass Co.*, 259 N. Y. 292; *Saglimbeni* v. *West End Brewing Co.*, 274 App. Div. 201, 298 N. Y. 875; *Bruckel* v. *Milhau's Son*, 116 App. Div. 832; *Dressler* v. *Merkel, Inc.*, 247 App. Div. 300.)

LEWIS, J. The plaintiff, Sadie Smolen, with her husband as coplaintiff, instituted this action against the defendants Grandview Dairy, Inc., and Owens Illinois Glass Company to recover for injuries sustained when a milk bottle, bearing the imprint of " Grandview ", broke in her hand while she was performing household duties. At the close of plaintiffs' evidence the cause of action alleged against the defendant Owens Illinois Glass Company was dismissed.

At Trial Term a jury awarded the plaintiffs a verdict. At the Appellate Division, where three Justices voted to reverse the judgment on the law and facts and to dismiss the amended complaint on the law, the Presiding Justice agreed with a majority of the court that the judgment should be reversed but favored a new trial, while one Justice voted for affirmance.

Direction for our inquiry upon the present appeal by the plaintiffs is given by the following provision in the order of the Appellate Division: " * * * it is Further Ordered that the findings of fact implicit in the jury's verdict, that the bottle was cracked while in the possession of the appellant dairy company, and that the dairy company, in its handling of the milk bottles, omitted to make any inspections or tests that were customarily made or used by bottlers of milk, are hereby reversed."

For the purposes of this opinion it will simplify our statement to refer hereafter only to the cause of action pleaded in behalf of the plaintiff wife who comes before us as an appellant.

The plaintiff's injury occurred while she was in the act of pouring for her niece a glass of milk from one of the defendant's partially filled bottles. We take from the plaintiff's own testimony a description of that occurrence: "I got hold of my bottle with the neck. I was going to pour a glass of milk for the child, and as I was about to pour, the bottle fell apart in my hand, and the top of the bottle was left in my hand, holding it. I was left holding the top in my hand, and then I saw the blood started to spurt out from my hand, so I dropped the neck of the bottle on the table, and I ran to the sink."

It is not disputed by the defendant that it owned and had filled with milk the bottle which broke in the plaintiff's hand. Nor is it disputed that the bottle which then broke was one of twelve placed that morning in a wooden case which was delivered at the store door of a grocer who, when he opened his store, placed it in a refrigerator. Later in the morning that bottle of milk was sold by the grocer to the plaintiff who carried it to her apartment with other purchases and placed it on a table where she opened it and poured out at least one glass of milk before the accident occurred.

The plaintiff's case against the defendant has as its basis testimony by a witness called as an expert who, on direct examination, testified in part as follows: "Q. And in your opinion, Professor O'Connell, what caused this fracture? A. The hypothetical question of counsel stated that the bottle was delivered, sold and used by the plaintiff, that while using it it broke and the bottom part fell to the table. The upper part of the bottle, the head, was thrown down. An examination of the bottle shows that it was properly manufactured. There was no excessive internal strain in the bottle. An examination of the fracture shows that it is a typical thermal shock fracture. That is, the break was produced by a crack being induced in the bottle, that the crack in turn being caused by the bottle being subjected to excessive temperature differential; *some place somewhere along the line this bottle had hot liquid hit it, causing a crack to form on the top.* Unfortunately the crack

wasn't sufficient to break the top off completely. The crack was incomplete. However, those things happen quite often, and then subsequent normal handling becomes the straw that breaks the camel's back, and the bottle then fractures completely. *The original necessary and competent producing cause of the fracture is thermal shock.*'' (Emphasis added.)

At a later point in his direct testimony the same witness stated that '' The thermal shock caused by somebody or something produced the fracture.'' The record contains no testimony by that witness, nor by any other witness, as to who was the '' somebody '' or what was the '' something '' which caused the incomplete crack; nor was there testimony as to *when* it occurred. When the same expert was asked by plaintiff's counsel whether the crack could have been discovered by '' reasonable inspection ''—his answer was '' Prior to filling the bottle and the crack being in the bottle at the time — *assuming that* — reasonable inspection would most definitely reveal the presence of that crack in it.'' (Emphasis added.) We find in this record no evidentiary basis upon which such an assumption can be made.

Considering a milk bottle to be a simple article in common household use — neither inherently dangerous, nor involving the potency of danger — we conclude, as did the Appellate Division, that neither the plaintiff's expert nor any other witness gave testimony — requisite to a cause of action (*Bourcheix* v. *Willow Brook Dairy,* 268 N. Y. 1, 7) — that while the bottle which broke in plaintiff's hand was in the defendant's possession, it was in any way defective or that the defendant had knowledge or notice of a defect therein.

Nor do we find evidence that in preparing for market the bottle and its contents which were ultimately purchased by the plaintiff the defendant failed to make those inspections which customarily are made by milk bottlers generally. On the contrary the procedure for the inspection, washing and filling of milk bottles, which undisputed evidence shows is followed in milk bottling plants generally, was the procedure followed in the defendant's plant which produced the bottle of milk that plaintiff purchased. (*Garthe* v. *Ruppert,* 264 N. Y. 290, 296; *Levine* v. *Blaine Co.,* 273 N. Y. 386, 389; *Smith* v. *Peerless*

*Glass Co.,* 259 N. Y. 292, 296.) That procedure is as follows: When empty milk bottles come into the plant they are placed on a conveyor which is illuminated from below by a series of lights and moves the bottles past an inspector who examines them for foreign substances, chips, " strays ", or broken bottles. The bottles then pass into a bottle washer which contains six compartments where different cleansing and rinsing solutions are successively applied to each bottle. The cleansing and rinsing solutions in those six compartments are maintained at the following temperatures: (1) 65 degrees Fahrenheit, (2) 105–110 degrees, (3) 135–140 degrees, (4) 105–110 degrees, (5) 85–90 degrees, (6) 60 degrees. At the discharge table, which receives the bottles from the washer, they are examined under a canopy light by a bottle inspector. The bottles — then at a temperature of 60 degrees — are passed on to the filling machine which by a vacuum process fills them with milk that has a temperature of 48–50 degrees. At this point we note an item of evidence of special importance which also stands uncontradicted — that, by the use of the vacuum filling process employed by the defendant, if there existed a crack in the body or lip of any bottle the bottle would not fill. After each bottle is filled it is capped, hooded and inspected by two inspectors and placed in milk bottle cases.

Claiming that the breaking of the bottle in plaintiff's hand resulted from *"thermal shock* caused by somebody or something "* (emphasis added), the plaintiff's expert defined " thermal shock " as follows:

" * * * If I have a set of bottles and I want to know whether they are all right as far as normal industrial use is concerned and I wish to subject them to a thermal shock test, I take those bottles, subject them to — from a sudden hot to a sudden cold or vice versa, with a temperature differential of seventy-five degrees. If they don't break them, I am happy.

" Q. In other words, it is a differential of seventy-five degrees in temperature? A. That's what I wanted to tell you about before."

The testimony by that witness revealed, however, that on the one occasion when he had inspected a milk bottling plant and had observed there the various processes by which milk bottles

are cleansed and filled, he did not see bottles subjected to a temperature differential of 75 degrees. Indeed it is clear from his testimony that in the plant he visited the cleansing of milk bottles was accomplished by a process similar to that in use in the defendant's plant and that the successive temperatures he there observed of cleansing solutions and rinsing waters applied to milk bottles showed differentials which compared closely to the differentials, noted *supra,* maintained by the defendant's cleansing and filling process. Likewise, although the same witness had testified that the use of a " polariscope " will expose to view a crack caused by thermal shock, he admitted that on the occasion when he inspected a milk bottling plant he did not see milk bottles subjected to examination by a polariscope.

In support of the present appeal the plaintiff relies upon *Saglimbeni* v. *West End Brewing Co.* (274 App. Div. 201, affd. 298 N. Y. 875). Aside from procedural factors peculiar to that case, there are other features which differentiate it from the case at bar. There, according to the record, the bottled product was beer — a liquid which after being bottled under pressure exerts upon the container, under certain conditions, an added internal pressure of 50 pounds per square inch. Moreover, in that case brushes which had an abrasive effect were employed in cleansing the bottles for use. From this evidence, the jury could find that the defendant negligently bottled its product. In the present case the liquid was milk, which is not bottled under pressure and which exerts no internal pressure after bottling. Furthermore, the cleansing process used by the defendant involved no abrasive action. In the *Saglimbeni* case (*supra*), there was evidence from which a jury could find lack of care by the defendant commensurate with the risk; in the case now before us proof of defendant's negligence is lacking.

Concluding, as we do, that the record contains no substantial evidence of a causal relation between some act or omission by the defendant in the preparation of the bottle of milk purchased by the plaintiff and the injury by its use which befell her, we affirm the judgment entered upon the order of the Appellate Division, without costs.

The judgment should be affirmed, without costs.

CONWAY, J. (dissenting). We are unable to concur in the decision here made. The ultimate and dispositive question in the case is peculiarly one of fact, viz., whether under all the circumstances the defendant dairy company used reasonable care in its inspection and handling of reused milk bottles. We believe that the Appellate Division infringed upon the constitutional province of the jury in deciding that question as a matter of law, in favor of the defendant. Moreover, we feel that the court acted at least in part, upon the mistaken, and potentially dangerous, assumption that defendant had satisfied its duty of reasonable care by taking only those precautions which are said to be customary in the milk bottling industry. If the defendant bottler was negligent in that the precautions taken by it were not adequate to eliminate hazards reasonably to be anticipated, it is no answer, we think, that other bottlers were likewise negligent and took similarly inadequate precautions. Since the decision herein will intimately affect the daily lives and the safety of millions of people in this State, we must express our disagreement.

Plaintiff suffered a deep and jagged laceration in her right palm when a milk bottle from which she was pouring " fell apart " in her hand. The bottle of milk had been purchased from a local grocer and bore the imprint of the defendant dairy company. Pieces of the broken bottle were preserved by plaintiff and examined by a glass expert. From his microscopic and polariscopic study of the broken pieces, he was able to testify with certainty that the sudden fracture of the bottle in plaintiff's hand had not been caused by an external blow, but had been caused by what he termed a " thermal shock ". In his own words, " An examination of the bottle shows that it was properly manufactured. There was no excessive internal strain in the bottle. An examination of the fracture shows that it is a typical thermal shock fracture. That is, the break was produced by a crack being induced in the bottle, that the crack in turn being caused by the bottle being subjected to excessive temperature differential; some place somewhere along the line this bottle had hot liquid hit it, causing a crack to form on the top. Unfortunately the crack wasn't sufficient to break the top off completely. The crack was incomplete. However, those things happen quite often, and then subsequent normal handling

becomes the straw that breaks the camel's back, and the bottle then fractures completely. The original necessary and competent producing cause of the fracture is thermal shock."

The qualifications of the expert were not disputed, nor was there any contradiction of his testimony as to the cause of the sudden fracture. Further evidence on behalf of plaintiff was sufficient to establish to the satisfaction of a jury that the thermal crack had not occurred after the milk bottle left the control of the defendant dairy company. The bottles were delivered to plaintiff's grocer in wooden cases, twelve bottles to a case with a separate compartment for each bottle. The cases were placed in a refrigerator in the store where they remained until the individual milk bottles were sold to the public. Plaintiff purchased the bottle of milk about 11:30 a.m. She put it in her shopping bag and went directly home where she placed the bottle on a table. At lunch time, she was pouring a glass of milk from the bottle when it cracked in her hand. As noted, the jury could find that the thermal crack was present in the bottle when it was delivered to the retailer. That, of course, leads to one of two inferences: Either defendant reused a defective bottle or the thermal crack occurred at some point along the defendant's bottling line. In either event, the determinative question is whether defendant exercised reasonable care under the circumstances in its inspection and handling of the bottles which, according to its practice, were used over and over again.

In that state of the proof, the burden was shifted to defendant to go forward with evidence that it did all that a reasonable and prudent person might be expected to do under the circumstances to detect the presence in the bottles of dangerous defects of the kind here involved. Defendant attempted to meet this burden by offering the testimony of one person, the man who was in charge of its pasteurization and bottling operations. He testified that when the bottles come into the plant they are in cases, twelve bottles to a case. Those *cases* are put on a conveyor under which there are a series of lights. An employee looks at the bottles in the cases as they move by him. The cases are then placed in stacks until nightfall when they are put back on the conveyor. Another employee then looks to see if there are any " foreign substance — chips, strays or broken bottles " in the case before it goes to the washer. At the washer, a man places

eight bottles at a time on a work table and they are tipped over into the prerinse compartment in water with a temperature of about 63 degrees. Then follows a series of washings and rinsings in chemically treated water with temperatures ranging from 63 degrees to 105-110 degrees to 135-140 degrees and then down again to a final rinse at about 61 degrees. The bottles then come out of the washer — still eight at a time — onto a discharge table where another employee watches to see if there are any " dirty bottles, cracked bottles, chipped bottles." The bottles are filled by extracting air from them, so that the milk is drawn in by the vacuum created. If there is a crack in the bottle, *sufficiently wide enough to let air in,* he said the bottle would not fill. The bottles are then capped by the use of a pneumatic lift. A man stands between the filler and the hooding machine and inspects the bottles with the milk in to see whether " the bottles are dirty, cracked or the bottle didn't fill up * * *." There were twenty-eight men in all working in the department and on an average night the company bottles 30,000 to 40,000 bottles of milk. There was no testimony that the defendant's employees were performing their assigned tasks at the time in question.

The witness admitted that men in the department did not see all the cracks that might be in the bottles as they moved by, and in particular that the man watching the bottles after they were capped could not see a crack in the neck of the bottle (which apparently was where the bottle in the instant case broke) because at that time a second cap or hood covers the neck of the bottle. He testified that the men watch each and every bottle even though the bottles pass at the rate of one per second. He further admitted that no magnifying glass nor special lights were employed, and that there were *no scientific tests at all.* He had never heard of a polariscope until he heard plaintiff's expert testify. He had heard of a hydrostatic pressure test but had never seen a hydrostatic machine. Likewise, he had heard of thermal shock tests, but he admitted that, " I wouldn't know one if I saw one ".

In the light of this testimony, we return to the testimony of plaintiff's expert. He flatly stated that a reasonable inspection prior to filling the bottle, would " most definitely reveal the presence of that crack in it." He continued: " A reasonable, careful ocular examination in the front — using a large magni-

fying glass and a large light would have revealed this crack since the crack must have been large in order to break due to normal handling, or the bottler could have used a polariscope and subjected the bottle to polariscopic examination, and the crack of course would have shown up very well then." He stated that this polariscopic test was acceptable in industry and provided for by the standard testing agency of the country, the American Society of Testing Materials, whose standards are the " bible " of the testing industry.

Defendant's counsel cross-examined plaintiff's expert primarily with reference to a tour taken by the expert through another milk bottling plant some years before. He elicited testimony that in that plant there had been no examination of all of the reused bottles, that men were merely placed at strategic points while the bottles went through the washing and filling process to eliminate the occurrence of " jams ". No polariscopic examination of the bottles was there made. He admitted that this was " the normal routine method ". This testimony as to the lack of examination in the other milk bottling company obviously weighed heavily in the judgment of the majority in the Appellate Division who, in reversing the jury verdict in plaintiff's favor and in dismissing the complaint, relied upon the fact that the defendant " in all respects followed the customary practice and procedure of bottlers of milk in its handling of the milk bottles." (276 App. Div. 854.)

On redirect, plaintiff's expert vehemently denied that the failure of the other milk bottling company to use a polariscopic examination meant that it was safe to put untested bottles in the hands of the general public. He added that bottles come into the plant after being subjected to use and abuse outside in the hands of customers and that the bottler is ignorant of the condition of the returned bottle unless he tests it. To the suggestion that methods were safe to the public simply because they were common accepted ordinary methods, the expert said that " Custom is oftentimes vicious, even though it is custom ", and that custom could not " substantiate the use or practice of putting out a bottle without testing."

The evidence, in our judgment, raised a clear question of fact as to whether defendant exercised reasonable care in inspecting the reused bottles for cracks and defects. The jury could find

that mere observation by men, without special training and equipment, of tens of thousands of bottles constantly passing by on a conveyor belt at the rate of one per second, at times when the bottles were either stacked in cases or the tops were capped with hoods, did not constitute reasonable care under the circumstances. The jury could further find that defendant was negligent in failing to subject the reused bottles to tests of any kind, polariscopic or otherwise. We are unable to understand why reasonable minds might not draw these inferences. Nor can we understand the process of reasoning by which a defendant is permitted to exonerate itself by showing that it was no more negligent than others in its business. As was said in another case involving a broken bottle *(Saglimbeni v. West End Brewing Co.,* 274 App. Div. 201, 204, affd. 298 N. Y. 875): '' If the hazard remained after standard tests were made the jury was not bound to find that such tests were conclusive proof of due care. It would be a strange doctrine indeed, to admit the hazard, created for economic reasons, and then say as a matter of law that the public must bear the risk.'' And as was aptly observed by Justice JOHNSTON below, '' The customary way of doing a thing may be a negligent way. Standard practice is not conclusive on the issue of negligence. It was for the jury to say, even though usage and custom were shown, whether the standard practice was negligent. If that were not the rule, defendants could, by a general custom or habit of acting, create a rule of law for their own exemption.'' (276 App. Div. 854.) (See, also, *Shannahan* v. *Empire Eng. Corp.,* 204 N. Y. 543, 550.)

The case of *Smith* v. *Peerless Glass Co.* (259 N. Y. 292), does not require a different result. That case, decided in 1932, was not intended to fix, for all time, the minimum standard of care necessary on the part of all bottlers to avoid liability for injuries caused by the use of defective bottles. Each case must stand on its own particular facts. In the *Smith* case *(supra)*, we held simply that the bottler's tests were adequate to guard against the risk of putting into the hands of the public a bottle which could not withstand *internal pressure from carbonated soda water.* The tests there used, in addition to visual examination, were the subjection of each bottle to a 35-pound per square inch pressure upon filling it with the carbonated beverage, and a further pressure of between 700 and 800 pounds on each bottle

upon capping with the crowning mechanism. In addition, there was there no evidence that any other and different tests were available for use by bottlers. These tests, we felt, were sufficient at that time to guard against the hazard of an explosion due to internal pressure. In the instant case, however, we are concerned with a different hazard — that of fracture due to thermal shock without any significant internal pressure. To say that the *Smith* case controls here is to say that this court in 1932 laid down a standard of industrial testing for all kinds of bottlers of all types of liquids for all time as to what conduct would be sufficient in law to absolve them of liability. The statement of the proposition contains its own refutation. While we feel that the *Smith* case is distinguishable from the situation here presented, we prefer to take the view that the standards of care which were judicially determined to be adequate eighteen years ago are not necessarily so today.

In short, we think that it was for the jury to find, under all the circumstances of the case, whether the methods used by the defendant herein were reasonably adequate to detect the anticipated hazard, and that this is so even though defendant may have used methods which are now, or were twenty years ago, customary in the bottling industry.

The judgment of the Appellate Division should be reversed and a new trial ordered, with costs to appellants to abide the event.

LOUGHRAN, Ch. J., DESMOND, DYE and FULD, JJ., concur with LEWIS, J.; CONWAY, J., dissents in opinion in which FROESSEL, J., concurs.

Judgment affirmed.